**MEMORANDUM IN SUPPORT OF 28 USC § 2255 MOTION**

## TABLE OF CONTENTS

INTRODUCTION ..... 1

I. HISTORY OF THE CASE ..... 2

II. ARGUMENT ..... 14

    COUNT 1; CONSPIRACY TO CAUSE WIRE FRAUD ..... 16

        A. THE $ 3.6 MILLION BANK STOCK SALE ..... 16

        B. THE $ 5 MILLION SWEVEN SYSTEM LOAN ..... 21

        C. THE $ 260,000 LOAN TO MONTGOMERY ..... 24

        D. THE $ 500,000 LOAN TO ALDAN ..... 25

        E. THE $ 240,000 WIRE FRAUD ..... 28

    COUNT 5; WIRE FRAUD ..... 30

III. COUNSEL'S REPRESENTATION DURING ALL STAGES OF TRIAL WAS INEFFECTIVE, IN VIOLATION OF ALDAN'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL ..... 32

IV. CONCLUSION ..... 38

## TABLE OF AUTHORITIES

Gentry v. Roe, 300 F.3d 1007 (9th Cir. 2003) ..... 33, 38

Nunes v. Mueller, 350 F.3d 1045 (9th Cir 2003) ..... 15

Visciotti v. Woodford,
288 F.3d 1097 (9th Cir. 2002) ..... 38

18 USC § 371 ..... 1, 14

18 USC § 1343 ..... 1, 14, 16

18 USC § 1346 ..... 1, 14, 16

5th AMENDMENT ..... 1, 38

6th AMENDMENT ..... 1, 38

## ADDENDUM

DECLARATION OF ELIZABETH C. ALDAN

## INTRODUCTION

This Habeas Motion accuses Mr. Arriola, defendant Aldan's legal counsel during trial, of failing to give competent representation during all critical stages of the trial, in violation of Aldan's Sixth Amendment right to effective counsel, and his Fifth Amendment right to be subjected to a fair trial. As a result of this constitutional violation Aldan moves the Court to issue a finding that Mr. Arriola's representation was constitutionally deficient, and issue an order to the prosecution to either subject Mr. Aldan to a new trial, or to dismiss the Indictment.

This prosecution involves an allegation that Aldan gave the Bank of Saipan dishonest service as president of the Bank, in violation of 18 USC §§ 371; 1343 and 1346. Specifically, the prosecution accused Aldan of aiding a conspiracy created by Mr. Montgomery and others to take ownership of the Bank, and then loot the Bank of its funds by fraudulent loans and other transactions. The prosecution alleged that Aldan aided the conspiracy by ratifying or approving these fraudulent loans or transactions without first seeking consent from the Board of Directors of the Bank for these loans, a violation of Bank Bylaws and the laws of the Commonwealth.

Had Mr. Arriola been competent he could have readily proven to the Jury that Aldan did not aid the conspiracy, and that he had no incentive to do so. Arriola's failure to prepare for trial was the chief cause of Aldan being convicted, and this deficiency should now be the cause for granting Aldan his Habeas Motion.

-1-

I. <u>HISTORY OF THE CASE</u>

Mr. Aldan's involvement with the Bank of Saipan began early in 1997 when Mr. Benigno Fitial, a member of the Board of Directors of the Bank, asked Aldan to become a member of the Board. Aldan accepted the position with the provision that he need not own any stock.

The first meeting Aldan attended, held on March 7, 1997, was an emergency session to address the sudden departure of the Chief Operating Officer. During this meeting the Board expressed its dissatisfaction with the President of the Bank, and Board member Jose Lifoifoi suggested that Aldan take over the operation of the Bank. This suggestion was reasonable since Aldan's experience as Secretary of Finance for the Commonwealth of the Northern Mariana Islands, and the Administrator of the NMI Retirement Funds for government employees, would make this appointment an asset for the Bank. The suggestion was unanimously approved by the Board, and Aldan became Chairman of the Board and Chief executive Officer of the Bank.

The Board consisted of 11 members, each member having one vote. 3 members represented the Calvo brothers, 3 members supported the interest of Hillbroom, 3 members represented the Tan family, Aldan had one vote, and another member had 1 vote for the miscellaneous holders.

According to the Bylaws of the Bank, and the laws of the Commonwealth (CNMI), a vote for the approval of loans required

a quorum of 2/3 of the members, and approval of 2/3 of the quorum. The Bylaws also required the recusal of any board member with a conflict of interest. This provision created problems with the Board members when Montgomery initiated his purchase because they could no longer vote for or against any loans as sellers of their stock. In fact, only Aldan remained a disinterested party because he did not own any shares in the Bank. As a result of this predicament 6 members ceased to exist the moment when Montgomery bought their shares, and the remaining members, with the exception of Aldan, no longer could participate, or participated in Board meetings. With only five members remaining, no quorum could be achieved.

Later that same year Aldan also took over the position of President of the Bank. Aldan's salary was $ 100,000 per year, and this amount was continued without interruption until February, 2002 when Mr. Montgomery was arrested and Aldan was asked not to show up at the Bank.

In the summer of 1998, the bank was examined by the Federal Deposit Insurance Corporation (FDIC), and the FDIC urged that a number of recommendations be implemented. Based upon these recommendations the Bank instituted a better loan documentation process. Thereupon, Aldan brought in about $ 10 million dollars in government deposits.

In the summer of 2000 the majority shareholders let it be known that they were willing to sell their shares. Early 2001 Aldan received news from Mr. James Nava that there was an interested buyer, and with permission of the Board members

offered stock at $18.00 per share. At this price a 100 % purchase of the shares would amount to approximately $ 5 million.

On June 23, 2001, a meeting was held in Las Vegas, Nevada where Aldan and members of the Board met, for the first time, Mr. Montgomery and Mr. Berkich. Montgomery explained that they were interested in the Bank because it would offer a center to process a debit card business he possessed. Montgomery added that he was very close to completing a deal with the Mexican government allowing him to compete with Western Unions' remittance business. Aldan and the Board members left the meeting with a favorable impression.

After a number of proposals and counter proposals the Hillbroom and Calvo brothers' members signed a Purchase Agreement for 60 % of the stock. The Tan family interest did not sign because the Family was in the process of reviewing the deal.

The Stock Purchase Agreement was reviewed from the beginning to end by the Bank's legal counsel, Mr. Pangelinan, who had an obligation to make sure that all provisions of the Agreement complied with the Bank's Bylaws as well as the laws of the Commonwealth. By him approving the Agreement, Mr. Aldan was assured that there were no contradictions or violations. Mr. Pangelinan was a government witness, and could have testified to this fact if Mr. Arriola, Aldan's counsel, had asked him.

A few weeks later Aldan received a letter from Michael

Bradly, Chairman of United Forex, an investment company that held Montgomery's stock portfolio, informed Aldan that the portfolio was worth $ 6.1 million "long call" ("long call" means that this is the value achieved after 1 year on the market), and that the Portfolio would be assigned to the Bank. Aldan refused the offer because no information was obtainable about the Portfolio, and wanted to liquidate it immediately because of risk factors. Montgomery agreed, and shortly thereafter Aldan received another letter from United Forex informing Aldan that they have transferred the Portfolio to Bank ownership, and that Aldan had the sole authority to liquidate it as he deemed proper. This occurred immediately.

Aldan then reviewed the Portfolio with James Nava, a financial consultant, who determined that the Portfolio was worth $ 3.6 million. This figure was independently confirmed by Alan Bernstein, CEO of My Discount Broker, the firm that had invested Montgomery's portfolio, who stated that the Portfolio could be sold for $ 3.7 million. My Discount Broker was retained by Aldan to liquidate the Bank's Portfolio. My Discount Broker remitted the funds realized from the sale to Secure West, a financial institution, who in turn transmitted the funds to the Bank of Saipan.

With that information Aldan contacted the Hillbroom and Calvo brothers and told them to prepare their stock certificates for sale. Aldan ordered the Accounting Manager, Mr. Flores, to prepare a $ 3.6 million Suspense Account to pay the Hillbroom and Calvo brothers, and that all funds realized

from the sale of the Bank's Portfolio must be immediately paid into the Suspense Account. This occurred within a week.

Unknown to Aldan, Mr. Montgomery ordered Mr. Flores and Ms. Francia to divert $200,000 from the Portfolio into his personal account without any processing of paperwork. Aldan was never informed about this transaction. When the Portfolio was exhausted, Mr. Flores came to Aldan and said that only $2.6 million had been realized. Aldan told Flores to take all funds found in Montgomery's personal account and apply it to the Suspense Account. $500,000 was found there, which allowed Montgomery to purchase only 54 % of the stock instead of 60 % available. The remaining 6 %, valued at $487,000, was kept in the Suspense Account based upon Montgomery's promise that more funds would soon be available. At the end of the year, when Montgomery did not produce more funds, Aldan closed the Suspense Account, and had the Bank purchase this stock as Treasury stock.

Aldan did not issue a Certificate of Ownership of 54 % of the stock to Montgomery until after the Portfolio had been liquidated, and after receiving approval from the Commissioner of Banking, dated January 11, 2002.

There were no funds advanced to Montgomery to purchase stock. The ownership of the Portfolio by the Bank, and the creation of a suspense account, are legal activities that do not need the approval of the Board. And in fact, the Board was kept fully apprised of these developments at all stages since they had a great interest in seeing it completed and getting

1. paid.
2. Shortly after Hillbroom and the Calvo brothers had been paid, the Tinian Dynasty Hotel and Casino requested reconsideration of its $ 5 million loan previously declined by the Board. Aldan resubmitted the application to the Board, and the Board again declined the loan. Aldan informed the Board that Montgomery thought it was a good loan, thereupon the members said, during a meeting called by Aldan shortly after payment was made to the Calvo's and Hillbroom, "Let him [Mr. Montgomery] approve it", meaning since Montgomery now owned the Bank, let him make all the decisions.

The loan was approved by Montgomery, and disbursed by the Bank with full knowledge of the members. Montgomery had become very interested and active in the Bank's business almost immediately after the completion of the sale of stock, even though no Certificate of ownership had been issued by the Banking Commissioner. The controlling law at this time was the Purchase Agreement giving Montgomery, as majority share holder, control over the Board, and the Bank's operation. The Bylaws of the Bank also functioned to support Montgomery's position since the laws required the sellers of stock to vacate their membership to the Board.

On or about November, 2001, a Mr. Wilson applied for a $ 5 million commercial loan to purchase additional shares in a credit card company that he had interest in. Montgomery referred the application to Aldan for final approval. Aldan objected because he did not have authority to approve loans of

-7-

such amount, and that Montgomery, as permitted by the Purchase Agreement, was the sole authority to approve all loans. Montgomery said he could not exercise his authority because of a conflict of interest. Mr. Wilson was a close friend and therefore delegated the authority to Aldan.

With this authority Aldan gave Wilson's application to Ms. Francia, the Loan Officer, for evaluation. Aldan declined the loan based upon Francia's evaluation that the application was incomplete, and lacked collateral. Montgomery assured Aldan that Wilson would guarantee a deposit of $ 5.6 million to cover the loan, and produced a Letter of Guarantee signed by Wilson. Aldan refused, saying that Wilson must first produce $ 5.6 million. But upon the personal recommendation of Montgomery that Wilson was of impeccable character with a wealthy family background, Aldan agreed to approve the loan.

Loans are approved based upon an evaluation of the "three 'C's", which consists of "character", "credit" worthiness, and the "capacity" to pay. Montgomery repeatedly vouched for Wilson's character and his ability to pay, and Aldan had no reason to mistrust Montgomery at that time.

During the time that Ms. Francia evaluated Wilson's application for $ 5 million loan, a request for a $ 500,000 advance was made by Wilson. Unknown to Aldan, this advance was made when Montgomery told Francia and Flores that Aldan had approved the advance. No documentation was produced by Montgomery. Aldan was on a business trip to a branch office on Rota at this time, and upon returning and learning about the

advance, angrily told Francia never to do this again without first confirming that he, Aldan, had approved such a matter. Aldan also told Montgomery never to do anything like this again.

On January, 2002, Aldan sent Francia and Flores to Plano, Texas, in order to be trained at the credit card facility that Wilson allegedly owned. They were very impressed with the operation and Aldan felt comfortable with the idea of Wilson transferring his operation to Saipan. This report from Francia and Flores, and the fact that the Banking Commissioner had approved the purchase by Montgomery, gave Aldan confidence that Montgomery was a reputable businessman.

Montgomery became very active in the operation of the Bank after the sellers had been paid. He created an "International Affairs Department" after he received approval of the Banking Commissioner to run the Bank, and made himself president of this department. The Bank rules and the Purchase Agreement allowed him to do this since he was the majority shareholder with 54 %, and Mr. Pangelinan, the Bank's legal counsel, had assured Aldan that this was within legal bounds. From this office Montgomery planned to supervise international deposits and loan applications. He ordered Aldan to prepare a Memorandum stating that Montgomery would be the sole entity that would approve all loans that before had been approved by the Board. Aldan transmitted the Memorandum to all Board members, but no member responded, and Aldan took this silence to mean that no Board member objected to the new procedure.

On or about December, 2001, Aldan applied for a real estate loan of $ 500,000. This loan was intended to construct a couple of two story houses on land that Aldan had acquired with a prior loan of $ 100,000 that had been given about 2 years before. Part of this loan was applied to the purchase of land and house on Rota as an investment, and to refinance the remaining balance of the original loan. Aldan asked the Loan Manager, Mr. Sablan, to complete the application using the information on the prior application, and to inform Aldan of any deficiencies. The new loan was completed and Sablan recommended approval to Montgomery based, on part, because the loan was collateralized by real property. The fact that the loan was fully collateralized negated the need for an appraisal. Montgomery approved the loan and Aldan account was credited with the amount. Aldan paid the balance of the prior loan, and paid for the property in Rota. Aldan also paid the contractor $ 40,000 to begin construction of the 2 story houses. The concrete foundations had already been poured and completed before March 1, 2002. However, the project was stopped when Aldan learned from an employee of the Bank that the F.B.I. had seized all his accounts. The balance was deposited in certificates of deposits with maturity coinciding with the construction phases. The two houses were slated to be completed by August, 2002. The Bank's Board was not advised of these transactions because they had already expressed a disinterest in the operation of the Bank.

About the time that Aldan received his loan Mr. Sablan

came to Aldan and said that Montgomery wanted a personal loan of $ 260,000. Sablan recommended that the loan be approved based on the fact that Montgomery owned 54 % of the Bank, and thus this loan was fully collateralized. Montgomery did not want to approve his own loan due to a conflict of interest, thus Aldan approved the loan based on the recommendation given to him. Besides the authority to approve loans delegated to him by Montgomery, Aldan was the sole remaining member of the Board due to the fact that all other members had defaulted their authority by 6 members having been paid, and the remaining 5 expecting to be paid shortly.

On or about February, 2002, shortly before Aldan left for Washington D.C. on a business trip, Ms. Francia came to Aldan wanting him to presign a document confirming that a wire transfer had occurred. Francia explained that it was about a wire to be transmitted to Mrs. Hom's husband in Hong Kong. Montgomery owed Mrs. Hom $ 240,000 and she wanted it returned. Aldan informed Francia that no such wire could be executed because Montgomery had no funds in his account due to the fact that all his funds had been applied to the purchase of stock. Aldan said that Francia could have the document signed by the Chief Operating Officer, Mr. Thomas Schoen, who also had authority to confirm the transmission of wires. Francia begged Aldan to sign because she did not get along with Mr. Schoen. This plea, and because she assured Aldan that the wire would not be sent before money would appear in Montgomery's account, Aldan presigned but did not date the document. It was only

during trial that Aldan discovered that the wire had been improperly sent and that it had been sent in his absence. It was the Accounting Manager, Mr. Flores, who had signed the approval for the wire since it was his duty to ensure that the wire was fully funded. Aldan had previously warned Flores never to transmit a wire or to incur any expenses without first checking that sufficient funds existed to cover the transaction even when the document bears his or Aldan's signature.

It was never Aldan's duty or authority to approve a wire transfer of any kind. His duty was only to review, upon completion of the transmission, that the wire had been sent. This confirmation document is the item that Aldan signed, not any approval to sent the wire.

Montgomery was arrested and charged in a multi count indictment charging conspiracy, bank fraud, and wire fraud on or about March, 2002. Wilson and Berkich were also arrested shortly thereafter with similar charges.

Aldan was arrested in April, 2002, and charged in a five count superseding indictment charging conspiracy to commit wire fraud, wire fraud, and deprivation of honest service.

Montgomery, Berkich, and Aldan went to trial on June, 2003. Wilson became a cooperating government witness, and the Jury convicted Montgomery and Berkich on most counts, and Aldan was found guilty on Counts 1 and 5. Montgomery was sentenced to 20 years imprisonment, Aldan received 10 years, and Wilson was given a 5 year sentence. Berkich committed suicide.

Aldan fired his attorney, Mr. Arriola, right after trial,

and retained Mr. Trapp for sentencing and appeal. The Ninth Circuit affirmed the convicted, but remanded for resentencing based on a <u>Booker</u> violation. Resentencing was denied by the court on September 6, 2005.

During trial Aldan discovered, from newspaper articles, that Arriola was himself facing criminal charges brought by the Commonwealth. He was charged with sexual abuse of a minor. He assured Aldan that his pending trail would not interfere in his representation, but Arriola never prepared for trial, as promised, and in fact became drunk every weekend.

Recently, in a drunken fit of rage, Arriola beat his wife and was charged with domestic violence by the Commonwealth.

II.                                        ARGUMENT

Count I of the the Indictment alleges that Tomas B. Aldan failed to give the Bank of Saipan his 'honest service' (18:1346) when he aided the conspiracy of Mr. Montgomery and others (18:371) to defraud the Bank by approving, as president of the Bank, illegal loans and wire transfers (18:1343) of Bank funds. The government repeatedly asserted that Aldan's malfeasance consisted of him failing to first obtain approval for loans to the conspirators from the Board of Directors, a violation of Bank Bylaws, and laws of the Commonwealth.

Count 5 alleged that Aldan approved an illegal wire transfer that had been obtained through "materially false and fraudulent pretenses", which deprived the Bank of Aldan's "honest services".

The overt elements of the offense are:

A.    Aldan illegally advancing Bank funds to the conspirators towards the purchase of Bank stock by failing to first seek approval of the loan from the Board.

B.    Aldan ratifying a $ 500,000 advance on a $ 5 million loan to Mr. Wilson, Montgomery's coconspirator, who allegedly owned Sweven Systems, and then allowed the disbursement of the remaining $ 4.5 million without first obtaining approval for the loan from the Board.

C.    Aldan illegally approving a $ 260,000 personal loan to Montgomery without first obtaining approval from the Board.

D.    Aldan illegally taking a $ 500,000 real estate loan by failing to first obtain approval from the Board. This loan

is the "sweetheart" incentive the prosecution alleges which enticed Aldan to aid the conspiracy.

  E. Aldan authorizing an illegal $ 240,000 wire transfer and concealing the transaction from the Board.

  The following will demonstrate that due to Mr. Arriola's deficient performance in preparing for trial caused Aldan to be convicted when the available evidence would have shown the Jury that Aldan did not commit the offenses charged, or that he did not give dishonest service to the Bank.

  Mr. Arriola's failure to prepare for trial failed to subject the prosecution's case to a meaningful adversarial testing during trial, and at closing arguments. It is the preparation for trial which constitutes the most critical period of the trial since it is at that time that a defense can be formulated, and a list of documents and witnesses prepared. Nunes v. Mueller, 350 F.3d 1045, 1052-53 (9th Cir. 2003)(granting Mueller's motion for new trial based upon ineffective assistance of counsel)

  The following presentation will address each of the overt acts alleged by the prosecution and demonstrate that in each case Mr. Arriola could have presented a competent defense had he properly prepared to do so. Aldan then will address Count 5 and show that he could not have approved the wire transfer because it was not his job to do so. Finally, Aldan will argue that counsel's closing argument was a rambling and incoherent babbling which did more harm than good, and should warrant a new trial without more.

-15-

### A. THE $ 3.6 MILLION SALE OF BANK STOCK

While the total value of the Bank's stock came to about $ 5 million, it was agreed that only two parties would initially sell 60 % of the stock for about $ 3.6 million to Mr. Montgomery, who agreed to sell his stock portfolio and buy the Bank stock with the proceeds. A complex procedure was set up by which Montgomery's portfolio was first handed over to the Bank, liquidated by Aldan for the Bank, the sellers paid for their stock, and concluding with Montgomery receiving his Certificate of ownership.

The prosecution alleged that this transaction amounted to an 'advance' or loan to Montgomery, and violated the Bylaws of the Bank because Aldan approved the transaction without first obtaining consent from the Board of Directors of the Bank for the loan. The prosecution also alleged that Aldan failed to ensure that there was sufficient collateral for the loan, which gave additional reason to suspect Aldan of giving dishonest service to the Bank. These acts by Aldan were in violation of 18 USC § 1346, and 18 USC § 1343 when the 'advance' was transmitted over interstate communications facilities.

The prosecution's allegation are facially false. Aldan never created an 'advance' or loan for Montgomery, nor anyone else, towards the purchase of Bank stock.

Upon the completion of a stock Purchase Agreement, fully analyzed and approved by the Bank's counsel, Aldan insisted that Montgomery's stock portfolio be first transferred to the

Bank before he would take any other action. See HISTORY OF THE CASE, supra. This transfer was not for the convenience of Montgomery, but to have the Bank become the sole owner of the Portfolio.

When the Portfolio became the property of the Bank Aldan then created a Suspense Account to receive the monies from the liquidation of the Portfolio. This Suspense Account also paid the sellers of 60 % of the Bank's stock their money. Thus the Bank was fully collateralized by its ownership of the Portfolio.

Unfortunately, the liquidation achieved only $ 2.8 million, even though My Discount Broker, the liquidator, had assured Aldan that it would achieve $ 3.7 million, sufficient to cover the $ 3.6 million the two sellers wanted. Whatever the reasons are for the shortfall, perhaps a downturn of the Market, Aldan cannot be blamed for the deficiency, and Arriola, Aldan's attorney, should have established during trial who had been responsible.

Unknown to Aldan, Montgomery intercepted $ 200,000 by ordering two other executives (Mr. Flores and Ms. Francia) to place this amount in his personal account. Aldan never was told of this diversion, and first learned about it during trial when the two executives testified about the event.

Aldan was told of the shortfall by Mr. Flores when the liquidation of the Portfolio had been completed. Aldan immediately ordered Mr. Montgomery's personal account to be taken and paid into the Suspense Account. But only $ 500,000

-17-

was discovered, and this increased the $ 2.6 million to $ 3.1 million, sufficient to pay for 54 % of the Bank's stock. The remaining 6 %, valued at $ 487,000, was kept in the Suspense Account until the end of the year when it was transferred into the Bank's Treasury Stock. This account was kept open based upon Montgomery's promise that he would soon obtain more funds to pay for the remaining 6 %. Montgomery never did.

The above events prove, had they been competently presented to the Jury, that Aldan never ordered an 'advance' or loan, thus there was no need to apprise the Board of anything. The creation of a suspense account is not a transaction requiring Board approval. Neither did Aldan give 'dishonest' service to the Bank by his remedial actions. The Bank did not suffer any harm, thus there can be no inference drawn of a dishonest intent, a necessary element of § 1346. The fact that he took Montgomery's personal account greatly militates against an inference that he assisted Montgomery in the fraud. Moreover, even if the Board had been required to vote an inherent conflict of interest existed from the time that the Board members wanted to sell their stock. By this factor alone none of the Board members, with the exception of Aldan who owned no stock, could vote to approve or disapprove a loan. Arriola should have made the Jury aware of this fact, but failed to do so because he had not prepared for trial.

Had Mr. Arriola prepared for trial he would have understood, from consulting with Aldan, the nature of the above transactions, and could have prepared a meaningful defense.

From Bank documentation Arriola could have established that the Bank became the owner of the Portfolio before the sellers were paid. He could have produced two letters from Michael Bradley and Darren Smith, Chairman and Secretary of United Forex, the company who transferred Montgomery's portfolio to the Bank, which gave notice of the transfer of ownership. The dates of these letters would have proven that the transfer was made BEFORE any money was paid to the sellers of Bank stock. And if that was not enough he could have subpoenaed these officers and have them testify and explain to the Jury the meaning of the two letters.

There was also the Bank's computer print-out of the Portfolio after it had been transferred, giving a date. Then there are remittance records from Secure West, the financial institution that transmitted funds from My Discount Broker to the Bank of Saipan. These records would have proven that there was no 'advance'. All these records were maintained by Mr. Flores, the Accounting Manager of the Bank, and he could have been forced to produce them when he was a witness for the prosecution.

He could have subpoenaed Mr. Bernstein, the CEO of My Discount Broker, and have him testify where the funds of the Portfolio had been sent to, and answer why the original estimate of $ 3.7 million that he gave Aldan suddenly became only $ 2.8 million. The answers to these questions would have dissipated the prosecution's innuendo that Aldan was giving the Bank dishonest service.