1.     Arriola could have established that Aldan was not part of
2. the $ 200,000 diversion Montgomery had ordered by asking
3. questions of Ms. Francia, the Loan Officer, and Mr. Flores, the
4. Accounting Manager, who was in charge of applying all Portfolio
5. funds to the Suspense Account. While both had already
6. testified to this fact to some extent, Arriola never put their
7. testimony in the context of the Bank owning the Portfolio by a
8. direct question; "Mr. Flores, who owned the Protfolio?".
9. During Closing Arriola could have used this testimony and
10. evidence to press home the fact that Aldan did not loan
11. Montgomery any funds with which to buy Bank stock.

12.     Arriola could have questioned the Bank's legal counsel
13. about the creation of a suspense account and any requirements
14. of notifying the Board. The Jury would have been informed that
15. no notice would have been required because it is a temporary
16. account to facilitate unusual transactions. This testimony
17. would have undermined the prosecution's suggestion of
18. malfeasance by Aldan since his activity was well within the
19. scope of the Bank's Bylaws.

20.     Finally, if Arriola had understood the case, he would have
21. given a closing argument firmly establishing in the Jury's mind
22. that Aldan did not fail to apprise the Board of anything. The
23. Board members were, in any event, well aware of what was going
24. on as interested parties since they were very anxious to sell
25. their stock.
26.
27.
28.

1.
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.

B.    THE $ 5 MILLION SWEVEN SYSTEMS LOAN

The Indictment alleged that the conspiracy intended to submit a fraudulent business loan for $ 5 million for Mr. Wilson, who purportedly owned Sweven Systems, a credit card company.  Wilson also proposed using the Bank as a processing center for his credit card company.  The allegation added that the fraud was aided by Aldan for failing to present to the Board the loan proposal and any related business agreements.

The Indictment also alleged that Aldan aided in covering up an illegal $ 500,000 advance which, although Aldan had not initiated, Aldan concealed from the Board.

The facts do not support the prosecution's case.  When this loan was processed by the Bank the Board no longer functioned.  There was no 'Board' for Aldan to seek approval from.  With Montgomery achieving 54 % of the shares he was the majority stock holder, and according to the Bank's Bylaws, and the laws of the Commonwealth, he could create his own board. See HISTORY OF THE CASE, supra. Furthermore, the 6 members of the Board who had sold their stock no longer had any business with the Bank, and the remaining 5 members could thus never achieve a quorum, as required by law.

Aldan approved the $ 500,000 advance as a formality.  He was very angry that the advance had been made without his knowledge, but afterwards was assured by Montgomery that the failure by staff to properly document the advance was harmless since Wilson was a good credit risk.  With this assurance Aldan belatedly signed the approval.  This does not constitute fraud,

1. or intent to defraud the Bank. Rather, his anger strongly
2. supports the position that he was not part of the conspiracy.

3.     Aldan initially resisted the approval of the loan. Bank
4. records demonstrate this fact. His loan officer, Ms. Francia,
5. considered it a risk, and based upon that evaluation Aldan
6. turned down the application. But Montgomery urged him to
7. reconsider and provided Letters of Guarantee from Wilson to
8. support the loan. Aldan told Montgomery that he should approve
9. the loan himself since he had all the authority needed, but
10. Montgomery said that such a procedure would introduce a
11. conflict of interest since Wilson was a personal friend. He
12. delegated the final loan approval to Aldan, and with the
13. personal assurance that Wilson had sterling credit ratings
14. Aldan approved the $ 5 million loan.

15.     Had Mr. Arriola properly prepared for trial he would have
16. understood what had occurred, and could have prepared a proper
17. and meaningful defense. First, he could have established that
18. the Board no longer functioned after Montgomery became the
19. majority stock holder. Pursuant to the stock Purchase
20. Agreement, and the Bylaws of the Bank, Montgomery could create
21. whatever office he wanted for himself, and to approve or
22. disapprove all loans. By extension, he had the power to
23. delegate this authority. Thus the government's claim that
24. Aldan failed to apprise the Board of this loan is without
25. merit.

26.     In order to establish this fact Arriola could have
27. produced the Bank's Bylaws, and have the Bank's counsel explain
28.

1. the relevant parts to the Jury. He could have had the
2. erstwhile Board members testify that at an earlier meeting,
3. right after Montgomery had purchased the majority shares, and
4. had approved a $ 5 million loan to the Tinian Dynasty Hotel and
5. Casino, that they had told Aldan they no longer wanted to
6. participate in the business of the Bank. They would have had
7. to testify to this fact because their expression was noted in
8. the Minutes of the Meeting, and recorded on tape. In fact, Mr.
9. Calvo, one of the Board members who had sold his stock to
10. Montgomery, and testified for the prosecution could have told
11. the Jury that he and the others no longer functioned as a
12. Board, and had expressed their disinterest during the Tinian
13. Bank loan meeting. All that Mr. Arriola had to do was ask him,
14. and the prosecution's claim of Aldan failing to advice the
15. Board would have collapsed.
16.     There is no other evidence suggesting that Aldan gave the
17. Bank any 'dishonest' service. His anger about Wilson getting
18. an advance without proper documentation militates against an
19. inference of aiding the conspiracy. Arriola could have asked
20. the Bank's counsel whether he thought Aldan's actions regarding
21. this loan were improper. It was the counsel's duty to make
22. sure no Bank regulations were violated. Counsel could have
23. confirmed that Aldan had acted properly within the Bank's
24. Bylaws. But Arriola did nothing because he did not understand
25. the case.
26.
27.
28.

C.    THE $ 260,000 LOAN TO MONTGOMERY

The prosecution alleged that Montgomery submitted a fraudulent personal loan application for $ 260,000 which Aldan approved without first obtaining consent from the Board of Directors. His failure to seek the Board's approval is the malfeasance.

The particular facts surrounding this event are as follows. The loan application was prepared by David Sablan, the Loan Manager. He highly recommended approval since Montgomery owned 54 % of the Bank, thus the loan was fully collateralized. Aldan approved the loan since Montgomery had delegated this power to him in view of a conflict of interest. Montgomery did not want to approve his own loan application.

As has been explained earlier there was no longer an active Board after Montgomery bought the majority of the Bank's shares. Montgomery had sole control over the approval of all loans. Moreover, each member of the Board had a conflict of interest since the majority had already sold their shares and the remaining members were waiting to sell theirs. Only Aldan could act independently since he owned no shares and had no conflict of interest.

In any case Montgomery delegated the approval of the loan to Aldan. No Bank Bylaws or Commonwealth laws were violated by this procedure. The prosecution has no case as charged. There is no evidence of 'dishonest' service.

Had Arriola prepared for trial he would have quickly disposed of the prosecution's case. Bank documents would have

shown that the loan had been submitted properly, evaluated properly, and approved properly. That Montgomery deceived everyone cannot be blamed on Aldan.

D.   THE $ 500,000 REAL ESTATE LOAN TO ALDAN

The prosecution alleged that the $ 500,000 loan to Aldan was illegal because the Board of the Bank had not approved the loan, but was instead approved by Montgomery. The allegation added that this loan showed that Aldan received favors from Montgomery for aiding the conspiracy to defraud the Bank.

The prosecution's allegation is baseless. As has been explained before, at the time of this loan there was no extant Board. The Board members had withdrawn their interest in any Bank business, and the stock Purchase Agreement and the Bylaws of the Bank had made Montgomery the sole authority to approve all loans. Aldan received the loan based on the merits of his application, and nothing more.

The facts of this event are as follows. The loan application was submitted to the Loan Manager, Mr. David Sablan, who reviewed and evaluated the loan. He recommended approving the loan based on the fact that Aldan had been granted prior loans, and that the instant loan was collateralized by real property that had been partially developed. Based upon this recommendation Montgomery gave final approval.

Contrary to the prosecution's innuendo this was not a

1. personal loan.  He had told the Jury that there was nothing on
2. the property, which was plainly false because the foundations
3. for two houses had already been poured.  The loan was intended
4. to complete the project, and payments out of the loan had been
5. structured such that regular payments for work completed would
6. be made to the contractor.
7.     Mr. Arriola failed to prepare for trial, and thus failed
8. to present the facts to the Jury.  He could have called Mr.
9. Lee, the owner of Moo Sung Construction Co., who would have
10. testified that the property had foundations, and that he was
11. contracted to build two houses.  Arriola could have produced
12. documentation showing that the loan was structured to pay Mr.
13. Lee as he completed the stages of the construction.  Arriola
14. could have produced Bank records showing Aldan's prior loans,
15. and how they were applied to this and other legitimate real
16. estate projects.  Then Arriola could have called the Real
17. Estate Appraiser to testify and show the Jury the viability of
18. Aldan's project.  The Appraiser could have confirmed that the
19. loan was fully collateralized and would be able to pay off the
20. loan over time.
21.     This would have destroyed the prosecution's implication
22. that Aldan received the loan as a favor in payment for aiding
23. the conspiracy.  The loan was completely legitimate and could
24. stand on the merits alone.  The loan was on a 15 year repayment
25. term, which was short in comparison to most 20 to 30 year
26. housing loans.  This fact demonstrated that Aldan was genuinely
27. interested in completing the project, rather than receiving a
28.

1. personal loan to play with.

2.     Arriola should have produced Aldan's overall loan records,
3. not only those with the Bank of Saipan, but the loans Aldan
4. had taken with other Banks as well.  Aldan had a very good loan
5. record, and Mr. Sablan could have been made to testify to this
6. fact.  This would have added weight to Aldan's position that
7. his real estate loans were approved on the merits.

8.     Regarding the employment contract that Montgomery had
9. offered Aldan , it is a good contract but nothing outrageous.
10. Aldan not only became president of the Bank, but also the
11. Chairman, and the salary offered was well within those
12. parameters.  But what is also a fact is that the contract was
13. never executed by Aldan because Montgomery had signed it as
14. Chairman of the Board, which he was not.  Aldan was Chairman,
15. and seeing this error Aldan simply put the contract away and
16. continued to receive his old salary and benefits.

17.     There is another aspect to this case that Arriola failed
18. to respond to.  The contract was stolen out of Aldan's desk
19. by Mr. Schoen at the behest of the F.B.I.  There was no warrant
20. for its seizure, thus the evidence of the contract should have
21. been suppressed.

22.     In any event Arriola did nothing to explain to the Jury
23. that the loan stood on its own without any need for favors from
24. Montgomery.  At Closing he did mutter something about how the
25. loan was structured and caused no loss to the Bank, but he did
26. not clarify to the Jury that the evidence did not show Aldan
27. getting any favors from Montgomery, an essential point because
28. the prosecution had to show motive.

1.
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.

### E.    THE $ 240,000 WIRE TRANSFER

The prosecution characterized this malfeasance as a fraud on the Bank and a 'customer'.  The customer is Mrs. Michelle Hom, the individual who apparently was gulled by Montgomery to invest about $ 500,000 into a project pushed by Montgomery. Montgomery wound up putting her money into his personal account.

At some point Mrs. Hom wanted her money back and Montgomery promised her that he would wire $ 240,000 to her husband in Hong Kong.  Montgomery then caused the Bank to execute the wire transfer without proper documentation, and the prosecution accused Aldan of approving the wire transfer.

The prosecution had mischaracterized the facts, and this error could have have easily been proven by Mr. Arriola.

Mr. Aldan did not and could not have approved any wire transfers.  It was the duty of the Accounting Manager, Mr. Flores, to process a wire transfer application, and check that the applicant had sufficient funds to cover the wire.  Thus it was Mr. Flores who approved and executed the wire; not Aldan. It is also a fact that Aldan was not present during the time the wire was approved and sent.  He was in Washington D.C. on a three week business trip.

The facts regarding this event are as follows.  A day before Aldan was to leave for the business trip Ms Francia, the Loan Manager and personal assistant to Mr. Montgomery, came to Aldan asking him to presign a document that confirmed Aldan had checked that the wire had been successfully sent.  This

1.  <u>document was not an approval form</u>.  It is only a formality
2.  <u>after</u> the wire had been approved by the Accounting Manager, and
3.  then checked by the Chief Operating Officer, Mr. Schoen, or the
4.  President, Aldan.

5.      ·Thus the prosecution's allegation are facially false.
6.  Aldan did not approve the wire.  He could not.  What Aldan did
7.  was to trust Ms. Francia not to transmit the wire until
8.  Montgomery produced more funds to cover the amount since Aldan
9.  knew Montgomery had no funds because all his money had been
10. taken to pay for Bank stock.  That Aldan's trust was violated
11. was not a criminal offense on the part of Aldan.

12.     Mr. Arriola could have established by testimony and Bank
13. records that the document Aldan presigned was not an approval
14. of the wire.  He could have produced the approval form and have
15. the Jury see that it had been Mr. Flores who signed the
16. approval, and then ask Mr. Flores why he had approved the wire
17. when Montgomery had insufficient funds in his account.  Arriola
18. could have called the Bank's legal counsel and have him explain
19. that it was not Aldan's responsibility to check the sender's
20. account.  Aldan's signature only signified that the wire had
21. been sent.  Arriola could have Ms. Francia explain why she
22. allowed the wire to be completed when she had promised Aldan
23. she would not unless sufficient funds appeared in Montgomery's
24. account.  All this would have shown the Jury that Aldan could
25. not be held responsible for approving the wire, as the
26. prosecution charges.  Neither could an inference be drawn that
27. Aldan violated some other provision of the Bylaws, and thereby
28. aided in the illegal transfer.

-29-

1.
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.

<u>COUNT 5     WIRE FRAUD</u>

The prosecution charged Aldan with devising a scheme to deprive the Bank of money by transmitting or causing to be transmitted a wire communication of $ 240,000 under false and fraudulent pretenses.  This is the same charge the prosecution made under Count 1.  This mouthful incorporates paragraphs 29 through 32, which identifies the illegal acts committed by Aldan, namely by authorizing the wire and concealing it from the Bank's Board of Directors.  ¶ 32.

This allegation has already been addressed earlier and shown to be baseless.  First, Aldan did not notify the Board because the Board no longer functioned or even existed.  And even if the Board still needed to be apprised of loans, this loan did not qualify because it was under $ 250,000.  In any event Aldan only had to report to Montgomery, and that he did. Second, as has been explained earlier, Aldan never approved the wire.  It was not his job, but that of Mr. Flores, the Accounting Manager.  Aldan's job was to review the completion of the wire, which is mere formality.  The transmission of wire is a simple job requiring only that the Accounting Manager make sure that the sender's account can cover the amount of the wire.

What Aldan did was to presign his reviewing of the transaction due to the fact that he was leaving on a 3 week business trip.  Ms. Francia implored him to sign due to her personal troubles with Mr. Schoen, who otherwise could have reviewed the transmission.  Aldan was assured that no date

1.   would be put by his signature until after the wire had been

2.   properly executed.  This did not happen, but Aldan cannot be

3.   held accountable for authorizing the wire.  He did not.

4.      Mr. Arriola failed miserably to make and present a defense

5.   which was almost self evident.  All the Bank's documents were

6.   available to show that Aldan did not approve the wire, and he

7.   could have asked Ms. Francia why she had not made sure that the

8.   wire was covered before it was sent, and ask Mr. Flores why he

9.   had approved the wire at all when Montgomery did not have any

10.   funds in his account.  All this evidence would have shown the

11.   Jury that Aldan cannot be blamed for the transmission of the

12.   money.  Likewise Arriola failed to make this point during

13.   closing arguments and explain in clear terms to the Jury what

14.   had happened, and that Aldan cannot be held responsible.

15.

16.

17.

18.

19.

20.

21.

22.

23.

24.

25.

26.

27.

28.

1.    III.        COUNSEL'S REPRESENTATION DURING ALL STAGES
               OF TRIAL WAS INEFFECTIVE, IN VIOLATION OF
2.             ALDAN'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL

3.        Mr. Arriola, Aldan's counsel, failed to put the

4.    prosecution's case to a meaningful testing to almost the point

5.    where he abandoned his client. Arriola completely failed to

6.    prepare for trial. He had promised Aldan that for the month

7.    before trial he would meet at Aldan's house every day and

8.    thoroughly analyze and discuss the prosecution's allegations,

9.    and what defenses to present. Had he done so Aldan could have

10.   explained to him in detail what had actually occurred at the

11.   Bank, and how he did not participate in any conspiracy to

12.   defraud the Bank, or commit any of the illegal acts the

13.   prosecution alleged he did. This preparation would have given

14.   Arriola the opportunity to understand the case, and prepare a

15.   list of documents and witnesses to be presented during trial.

16.        As a result of Arriola failing to meet even once he had no

17.   idea what the alleged offense was really about. He could not

18.   understand that the prosecution's allegation were plainly

19.   erroneous from documents available from the Bank and from the

20.   prosecution's own witnesses who could have testified for the

21.   defense had they been asked the right questions. His ignorance

22.   is evident from his closing argument where he stated, from the

23.   outset, that the issue was not whether Aldan committed the

24.   crime, but whether the prosecution had proven its case. RT

25.   4529-29 (RT denotes Record of Transcripts of Closing). That is

26.   not the case at all. Aldan was and is innocent because the

27.

28.

1. facts of the case could have shown his innocence if they had
2. been put into the right context. Instead, the prosecution was
3. allowed to prove its case because Arriola failed to put up a
4. defense. There were more than enough uncontested allegations
5. made during trial to make a defense of insufficient evidence
6. untenable.

7.     Arriola especially failed Aldan during closing arguments.
8. Closing is not merely a pro forma aspect of the criminal case,
9. but an essential part which sharpens the issues of the case,
10. and places into context a defendant's position. Gentry v. Roe,
11. 300 F.3d 1007, 1014 (9th Cir. 2002). Only at Closing can a
12. defendant bring together the prosecution's case as the defense
13. sees it and point out weaknesses in the prosecution's
14. presentation. It is during this time that the defendant has
15. his last chance to show the jury that there may be reasonable
16. doubt of guilt.

17.     Arriola's Closing was a rambling and incoherent assembly
18. of mistaken statements which did more harm than good. The
19. confusion he spread only confirmed in the Jury's mind that
20. Aldan had no defense. Instead of claiming that the prosecution
21. had not proven its case, RT 4532, he should have demonstrated
22. to the Jury, point by point, that the facts in the record
23. proved Aldan to be innocent. Arriola should have methodically
24. approached each of the allegations made by the prosecution and
25. explain to the Jury, in detail, how the facts demonstrate that
26. Aldan was not part of any conspiracy.

27.     Had Arriola been competent he would have begun by
28.

1.  explaining to the Jury that Aldan did not fail to seek approval
2.  for loans from the Bank's Board.  This was an essential point
3.  because the prosecution's fundamental complaint against Aldan
4.  was that he had failed to notice the Board of the loans, as is
5.  required by law.  Arriola should have explained, in detail and
6.  from documents and testimony, that Aldan could not report to a
7.  Board that no longer existed after Montgomery obtained majority
8.  shareholder.

9.  Next, Arriola should have immediately and thoroughly
10.  attacked the prosecution's claim of a "sweetheart" deal.
11.  Arriola did recognize that the prosecution's case "hung" on
12.  this allegation, RT 4532, but instead of developing Aldan's
13.  innocence by showing that the new employment contract was never
14.  implemented, and that Aldan's loan had a legitimate basis,
15.  Arriola left reality by suggesting that maybe the Bank's Bylaws
16.  may not have been ratified, thus Aldan really had not violated
17.  any laws.  RT 4535.  What kind of argument is this?  It plays
18.  right into the prosecution's case because it admits that Aldan
19.  had failed to apprise the Board.  Arriola repeats this nonsense
20.  at RT 4537: 8-9.  There is simply no method to Arriola's
21.  closing.  He jumps from subject to subject without any
22.  structure.

23.  Arriola then rambles on about the prosecution's CPA
24.  witness, Mr. Burger, who said that the loan policy had been
25.  violated during the processing of Aldan's loan.  RT 4537-38.
26.  Instead of attacking Mr. Burger's conclusory statement, which
27.  was based on false premises, Arriola wandered off about the
28.

1. F.B.I coming in and taking documents and about the Bylaws not
2. having been ratified, and about Aldan being upset when a $
3. 500,000 advance to Mr. Wilson had been made without his
4. knowledge.   Where is the structure in Arriola's argument?
5. Arriola never explained to the Jury that Mr. Burger's
6. conclusion is predicated on a Board still existing while the
7. obvious fact is that there is no Board left. Obviously Arriola
8. has no clue what this case is about.

9.     Arriola did nothing to mitigate the prosecution's
10. allegation that Aldan had interfered with his loan application
11. by ordering the appraisal of the property to be waived, thereby
12. suggesting that Aldan was defrauding the Bank. RT 4545: 2-5.
13. Arriola failed to explain that an appraisal was unnecessary due
14. to the fact that the loan was fully collateralized by real
15. estate, as indicated in the loan document. All Arriola said in
16. defense was that the prosecution produced only one witness.

17.     Regarding the $ 260,000 personal loan to Montgomery
18. Arriola never explained that Montgomery had delegated the
19. authority to approve the loan to Aldan, a procedure expressly
20. formulated by the Bylaws. Montgomery could not approve his own
21. loan.   The loan had been fully analyzed and approved by the
22. Loan department, and forwarded to Aldan for final approval.
23. Aldan's decision to approve the loan was a realistic business
24. decision, not a favor to Montgomery. Regarding the claim that
25. Aldan had failed to apprise the Board, Arriola did not remind
26. the Jury that there was no Board to give notice to.

27.     Arriola's arguments are very confusing.  For instance, at
28.

-35-

1.    one point he talked about Ms. Francia pushing for the approval
2.    of Montgomery's personal loan, and in the same breath he
3.    changes the subject to Exhibit 26, which appeared to involve a
4.    wire 'ticket'.   It is unclear what this wire 'ticket' is.
5.    Maybe it referred to the $ 240,00 wire transfer for Mrs. Hom.
6.    RT 4548.   The confusion is aggravated by Arriola when he
7.    suddenly changed to talking about the Calvos and the JLH Trust
8.    and them wanting their money, apparently in reference to the
9.    alleged $ 3.6 million advance Aldan was accused of staging.   RT
10.   4549.   What was Arriola's strategy, if there was any?   Was he
11.   trying to show how confusing the prosecution's case was?
12.   Certainly his ramblings must have confused the Jury because
13.   even with the advantage of reading the Transcripts little makes
14.   sense.   If indeed Arriola's strategy was to sow confusion then
15.   this is a dangerous strategy because a Jury does not appreciate
16.   being played with.
17.        Arriola   at   some   point   actually   argued   for   the
18.   prosecution's case when he told the Jury that Aldan was
19.   liquidating the Bank's Portfolio for Montgomery.   RT 4550: 8-
20.   26.   Obviously Arriola did not understand what had happened
21.   since he had not reviewed the Bank records or asked Aldan about
22.   this event.   The fact of the matter is that Aldan was not
23.   liquidating the Portfolio for Montgomery at all.   That mistaken
24.   assumption only reinforced the prosecution's claim that Aldan
25.   aided Montgomery's conspiracy.   Aldan was actually liquidating
26.   the Bank's Portfolio, and had directed Bank staff to place all
27.   funds achieved from the Portfolio into the Suspense Account
28.

1. that Aldan had created in order to pay the sellers of Bank

2. stock.   This transaction had no business with Montgomery.

3. Montgomery had turned over his Portfolio **to the Bank**, and was

4. given his Certificate of majority stock holder afterwards when

5. the Bank's portfolio had been completely liquidated, and the

6. Banking Commissioner had approved the sale.

7.      Arriola did nothing to explain to the Jury that Aldan did

8. not approve the wire transfer, as charged in Count 5.   RT 4553-

9. 4554.   Apparently Arriola did not understand how wire transfers

10. were made, or who was responsible for transmitting them.   Had

11. he asked Aldan about wire transfers, and had he obtained Bank

12. records, he could have shown the Jury substantial evidence

13. demonstrating that Aldan had not approved any wire because this

14. action was not part of his responsibility.   He could have shown

15. the Jury who actually had signed the approval, and then tied

16. together these facts and have the Jury understand that Aldan

17. had nothing to do with the execution of this wire, as was

18. charged.

19.      So much more could be said about Arriola's deficient

20. closing argument.   Reading page after page of the Record is

21. like being stranded in a rowboat tossed about in a storm

22. without a rudder.   Arriola had at his disposal the resources to

23. attack the prosecution's case point by point, but he was a

24. drunk who neglected his constitutional duty to Aldan to

25. conscientiously study the case and formulate a meaningful

26. testing of the prosecution's case.   He was too preoccupied with

27. his own pending criminal case for sexually abusing a minor.

28.

1.  Closing arguments are an essential element of a
2.  defendant's case. <u>Gentry v. Roe</u>, 300 F.3d 1007, 1014 (9th Cir.
3.  2002). That Court reversed and remanded for a new trial
4.  because the jury was presented with a "rambling" and
5.  ineffectual closing argument that failed to address the only
6.  aspects of the case that mattered. This constituted a
7.  violation of a defendant's Sixth Amendment right to competent
8.  counsel, and the Court concluded that a reasonable probability
9.  existed for the results of the trial to have been different had
10. counsel acted competently. <u>Id</u>, citing <u>Visciotti v. Woodford</u>,
11. 288 F.3d 1097, 1108 (9th Cir. 2002)(explaining that "A
12. 'reasonable probability' is **less** than a preponderance"
13. (emphasis original)).
14.  Like in <u>Gentry</u>, Arriola's performance during Closing was
15. incoherent. It did not address the facts which would have
16. shown that Aldan did not aid the conspiracy. Arriola made
17. serious mistakes which actually bolstered the prosecution's
18. case. There is more than a reasonable probability that had
19. Aldan's counsel methodically addressed the prosecution's case
20. point by point, then the Jury would not have found Aldan guilty
21. of the offenses charged.
22. IV.                      <u>CONCLUSION</u>
23.  Based upon the above, the record of this case, and
24. extrinsic evidence, this Habeas Motion should be granted, and
25. Aldan given a new trial with competent counsel.
26. DATED August 12ᵗʰ, 2006, by:
27.
28.                           TOMAS B. ALDAN

1.
2.

# DECLARATION OF ELIZABETH C. ALDAN

3.      I, ELIZABETH C. ALDAN, do hereby declare the following to
4.  be true and correct to the best of my knowledge and belief.
5.
6.  1.    I am the wife of TOMAS B. ALDAN, and I have been married
7.  to him since March 11, 2004.  That prior to our marriage I was
8.  living with him for about 10 years as Common-Law spouse.
9.
10. 2.    That approximately one (1) month prior to the trial of my
11. husband  I  attended  a  meeting  between  my  husband  and  his
12. attorney, Mr. Joey Arriola, at his office in Garapan, Saipan.
13. At that meeting I heard Mr. Arriola say that he will be having
14. almost  daily  meeting  with  my  husband  to  cover  the  various
15. aspects  of  the  upcoming  trial.  He  also  said  that  he  would
16. review and discuss the trial each day in order to configure and
17. prepare the defense.  Importantly, the after trial meetings and
18. discussions  would  concentrate  on  the  testimony  given  by  the
19. government's witnesses.
20.
21. 3.    No  such  meetings  ever  occurred,  either  before  trial  or
22. after trial.  I know this to be a fact because I was intimately
23. involved with my husband's trial and paid attention to every
24. detail.
25.
26. 4.    Also  during  this  initial  meeting  Mr. Arriola  mentioned
27. that he will need help to prepare for the trial, such as
28.

1. typing, filing, copying, and preparing files, as well as
2. running various errands. I immediately volunteered my services
3. to do any and all those jobs. My services would have been very
4. useful because I have had 20 years experience as a secretary.
5. In fact, Mr. Arriola requested during this initial meeting that
6. my husband obtain about 15 3" binders which would be used in
7. the preparation of trial. I personally purchased the binders
8. and delivered them to Mr. Arriola's office on the next day. I
9. never saw those binders again.
10.     In addition, my husband said that some of his brothers and
11. sisters could assist in this matter.
12.
13. 5.  I was never contacted by Mr. Arriola, or anyone else, to
14. assist in my husband's preparation for trial or his defense.
15. Neither was anyone else called by Mr. Arriola to help prepare
16. for trial. As far as I know Mr. Arriola did nothing to prepare
17. for my husband's trial or defense at any time after our initial
18. meeting.
19.
20.     I declare, under penalty for perjury, that the foregoing
21. is true and correct.
22.     Stated this 5 day of *August* , 2006, at Saipan
23. CNMI,
24.
25.     by *Elizabeth Aldan*
26.         ELIZABETH C. ALDAN
27. ///
28. Declaration of E. Aldan        -2-